## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

| | | |
|---|---|---|
| **GARY MARTIN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 3:08cv0587 DPJ-JCS** |
| | ) | **JURY TRIAL DEMANDED** |
| **HOMESITE INSURANCE COMPANY;** | ) | |
| **HOMESITE SECURITIES COMPANY,** | ) | |
| **LLC; HOMESITE GROUP, INC.; and** | ) | |
| **JOHN DOES 1-10** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| _____ | ) | |

### FIRST AMENDED COMPLAINT

Gary Martin (herein "Plaintiff"), by and through counsel, and files this First Amended Complaint against Defendants Homesite Insurance Company, Homesite Securities Company, LLC; Homesite Group, Inc. and John Does 1–10 (herein "John Does" or "Does"), and alleges as follows:

### I.
#### PARTIES

**1.** At all relevant times, Plaintiff was an adult resident citizen of Edwards, Hinds County, Mississippi, residing at 8700 Anderson Road, Edwards, Mississippi 39066.

**2.** Defendant Homesite Insurance Company (herein "Homesite") exists under the laws of Connecticut, and has its principal office at 185 Asylum Street, Hartford, Connecticut 06103-3499. Its mailing address is 99 Bedford Street, Boston, Mass. 02111 and its agent for service of process is CT Corp. Systems of Mississippi, 645 Lakeland

East Drive, Suite 101, Flowood, Mississippi 39232, or statutorily, the Mississippi Commissioner of Insurance, P.O. Box 79, Jackson, Mississippi, 39205-0079.

3. Defendant Homesite Securities Company, LLC (herein "Homesite Securities") exists under the laws of Delaware, and has its principal office and mailing address at 99 Bedford Street, Boston, Mass. 02111.  Its agent for service of process is Corporation Service Company, 84 State Street, Boston, Mass. 02111.

4. Defendant Homesite Group, Inc. (herein "Homesite Group") exists under the laws of Delaware, and has its principal office and mailing address at 99 Bedford Street, Boston, Mass. 02111.  Its agent for service of process is Corporation Service Company, 84 State Street, Boston, Mass. 02111.

5. Defendants Homesite, Homesite Securities and Homesite Group, collectively "the Homesite Defendants," are affiliated corporations.  Homesite Insurance Company is a member of an insurance holding company system of which Homesite Securities is the immediate parent.  Homesite Securities is wholly-owned by Homesite Group, Inc., the ultimate controlling parent.  Homesite's board of directors are officers of Homesite Group.  Homesite is a party to an Intercompany Service Agreement with Homesite Group wherein Homesite Group provides administrative services and facilities to Homesite.  Homesite and its affiliates are part of a consolidated federal income tax allocation agreement with its ultimate parent, Homesite Group. At all times relevant to this action, the Homesite Defendants were doing business in Mississippi, including Hinds County, Mississippi; made a contract with a resident of Mississippi to be performed in whole or in part in Mississippi; committed a tort in whole or in part in Mississippi; and/or performed work or service in the state of Mississippi.

6.     Defendants John Does 1–10 are persons and/or entities affiliated with Defendants and/or have acted in concert with Defendants and whose identities are currently unknown. All allegations and claims asserted against the Homesite Defendants are incorporated by reference against presently unidentified John Does 1–10. When their identities are known, said John Does will be identified by name, and if necessary, joined in this action pursuant to the Rules 18, 19 and 20, Federal Rules of Civil Procedure.

## II.
### SUBJECT MATTER AND PERSONAL JURISDICTION

7.     This Court has jurisdiction over the subject matter and Defendants in this case pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and the Homesite Defendants, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

## III.
### VENUE

8.     Venue in this cause is proper in this Court pursuant to 28 U.S.C. § 1391 because this suit respects real and personal property located exclusively in Hinds County, Mississippi, and the conduct, acts and/or omissions upon which this cause of action is based occurred in Hinds County, Mississippi, which is entirely within the United States District Court for the Southern District of Mississippi, Jackson Division.

## IV.
### ACTS OF AGENTS

9.     Whenever in this First Amended Complaint it is alleged that any Defendant or Defendants, including John Does 1–10, did any act or thing, or failed to do any act or thing, it is also meant that the officers, agents, representatives or employees of the Defendant or Defendants respectively performed, participated in performing, or failed

to perform, such acts or things while in the course and scope of their employment or agency relationship with the Defendant or Defendants, and in furtherance of the Defendants' business.  Whenever the wrongful or negligent acts or omissions complained of herein are the result of or are caused by employees or agents of any Defendant or Defendants, Plaintiff is further entitled to all such relief accorded to him under *Miss. Code Ann*. § 85-5-7.

## V.
### JOINT TORTFEASORS

**10.**     Whenever Plaintiff sustained injury or damage to his person or property as a result of the joint acts or omissions of the Defendant or Defendants and their agents, representatives and/or employees, (including John Does 1–10), in pursuing a common plan or design, Plaintiff is entitled to a judgment against the Defendants jointly and severally, as prescribed under *Miss. Code Ann*. § 85-5-7.

## VI.
### RULE 9(b) FACTS

**11.**     At all times relevant, Gary Martin was the owner of a single family dwelling located at 8700 Anderson Road, Edwards, Mississippi 39066 (herein "the Martin house").   For reference, a color photograph of the house is attached as Exhibit 1 to the original Complaint.

**12.**     The Martin house was constructed between August and December, 2004. During construction, the Martin house was inspected by Hinds County Building Permit Department (herein "Permit Department") on four occasions, and passed each inspection.

**13.**     On December 3, 2004, a Certificate of Occupancy was issued by the Permit Department, certifying that the Martin house was constructed in accordance with

applicable building codes.

14. The roof rafters of the Martin house are made of 2 x 10 inch solid wood boards, spaced at 16 inch centers. Surrounding porches border the west and south sides of the Martin house. The roof rafters over the porches are constructed with 2 x 8 inch solid wooden boards.

15. The roof rafters of the Martin house and surrounding porches meet or exceed the requirements of the applicable building codes. The roof construction in general, including by way of example, the shingles, black felt moisture barrier, decking, rafters, insulation and interior ceiling boards, all meet or exceed the requirements of the applicable building codes.

16. After completion of the Martin house, Plaintiff applied for and purchased a policy of homeowners insurance from Homesite (herein "the 2005 policy"), effective from 12-31-04, 12:01AM through 12-31-05, 12:01AM. Before issuing the 2005 policy, Homesite evaluated the Martin house under its underwriting guidelines, set the coverage limits, and decided that the Martin house was an acceptable risk to insure. A copy of the 2005 policy (pertinent pages only) along with a Certificate of Authenticity provided by Homesite, is attached and incorporated by reference to the original Complaint as Exhibit 2.

17. The 2005 policy listed Plaintiff as the named insured, and insured the dwelling; other structures; personal property therein; and provided loss of use coverage.

18. The 2005 policy provided coverage limits as follows: $280,000 for Dwelling; $28,000 for Other Structures; $196,000 for Personal Property; and $56,000 for Loss of Use. (*See* Exhibit 2, Declarations).

19.     The 2005 policy is an "all-risk" policy, which provides coverage for all physical "direct loss" to Plaintiff's "Dwelling" and "Other Structures" unless otherwise specifically excluded by other provisions in the policy. In pertinent part, the policy states:

> **SECTION I- PERILS INSURED AGAINST**
> **COVERAGE A-DWELLING AND B-OTHER STRUCTURES:**
>
> We insure against risk of direct loss to property described
> in Coverage A – Dwelling Protection and Coverage B –
> Other Structures Protection only if that loss is a physical
> loss to property.

20.     The all-risk coverage in the 2005 policy provides coverage for losses and damages caused by windstorms and hail.   (*See* Exhibit 2).

21.     The named perils coverage in the 2005 policy provides coverage for "direct physical loss" to Plaintiff's "Personal Property" caused by one or more of any sixteen (16) named perils, unless specifically excluded by other provisions in the policy. The named perils covers losses and damages caused by windstorm and hail.  In pertinent part, the policy states:

> **COVERAGE C-PERSONAL PROPERTY**
>
> We insure for direct physical loss to the property described
> in Coverage C caused by a peril listed below unless the loss
> is excluded in SECTION 1 – EXCLUSIONS.
> . . .
>
> 2.     Windstorm or Hail.

22.     From December 31, 2004, through December 31, 2005, Homesite collected and appropriated for its own use and benefit $1,667.00 in premiums paid by Gary Martin as consideration for the 2005 policy.

23.     At all relevant times, including August 29, 2005, when Hurricane Katrina swept through Hinds County, Mississippi, and damaged the Martin house, the 2005

policy was in effect, and the premiums were current and paid-up.

24.    On December 31, 2005, at 12:01 AM the 2005 policy was renewed for an additional annual period (herein the "2006 policy"), effective from 12-31-05, 12:01AM through 12-31-06, 12:01AM.  A copy of the 2006 policy (pertinent pages only) along with a Certificate of Authenticity provided by Homesite, is attached and incorporated by reference to the original Complaint as Exhibit 3.

25.    The 2006 policy listed Plaintiff as the named insured.  The 2006 policy insured the dwelling; other structures; the personal property therein; and provided loss of use coverage.

26.    The 2006 renewal policy provided coverage limits as follows: $294,000 for Dwelling; $29,400 for Other Structures; $203,000 for Personal Property; and $58,800 for Loss of Use.  (*See* Exhibit 3, Declarations).

27.    From December 31, 2005, through May 27, 2006, Homesite collected and appropriated for its own use and benefit, $1,772.00 in premiums paid by Martin as consideration for the 2006 policy.

28.    At all relevant times, including May 27, 2006, when tornado winds swept through rural Hinds County, Mississippi, and damaged the Martin house, the 2006 policy was in effect, and the premiums were current and paid-up.

## A.    PLAINTIFF'S KATRINA LOSS OF AUGUST 29, 2005

29.    On August 29, 2005, at a time when the Martin house was only 269 days old, winds driven by Hurricane Katrina (herein "Katrina") damaged the home.

30.    Gary Martin gave timely notice of his claim to Homesite in compliance with terms of the 2005 policy and applicable regulatory bulletins of the Mississippi

Department of Insurance.

31.      After notice to Homesite, on September 10, 2005, Michael Davis (herein
"Davis") of Crawford & Company, as agent for Homesite, arrived to inspect the Martin
house for damage.

32.      On September 10, 2005, Gary Martin met Davis in person at the Martin
house and told him that while riding the storm out inside the house, he observed an
opening where light shined in between the seam of the roof and an interior wall.  Martin
informed Davis that he thought the roof had lifted during the storm, and stated that he and
his family became afraid and fled the house.  Martin told Davis that after returning he
discovered the rear French doors had blown outward, inverted off their hinges, and
broken part of the door casement.  Martin told Davis that he thought the Katrina winds
may also have lifted the roof over the front porch.

33.      Supposedly there to inspect, adjust and assess damage, Davis took no
photographs of the blown-out doors or of damaged or downed trees in the vicinity.
Because Davis had come without a ladder, Martin had to provide one for Davis to go on
the roof and inspect it.

34.      Davis walked on the main roof of the Martin house on September 10,
2005, and noted in his report dated the next day that the roof decking was "sagging."
(*See* Davis' report, dated September 11, 2005, entitled "Property Adjuster's Transmittal,"
attached to the original Complaint as Exhibit 4).

35.      Despite seeing the obvious sagging, (technically called "deflection"),
Davis did not remove any roof sheathing, and did not inspect the roof rafters of the
Martin house or the rafters of the two surrounding porches.  Davis told Martin that a

structural engineer "buddy of his" would inspect the Martin house, including the roof areas which were a major concern of Martin's.

36.     Without taking any measurements, inspecting any rafters, or looking beneath the roof sheathing, on September 11, 2005, Davis wrote a report to Homesite stating that the sagging roof on the Martin house "cannot be related to the Hurricane." Davis' report claimed that the roof sagging was related to rafters being spaced too far apart:

> THIS CANNOT BE RELATED TO THE HURRICANE. IT APPEARS THE DECKING IS SAGGING CAUSE THE RAFTER [sic] ARE TOO FAR APART [sic] THE DECKING IS PARTICLE BOARD. HOWEVER [sic] THE HOUSE IS ONLY 11 MONTHS OLD.

*Id.*

37.     On September 11, 2005, Davis wrote Homesite that it will need to hire a structural engineer to inspect the Martin house.  Davis wrote: "the only way the insured would be satisfied" is to hire a structural engineer "to inspect the home."  (*See* Crawford-Homesite claims log excerpts, Davis email to Jim Barbee of Crawford & Company, attached to the original Complaint as Exhibit 5).  Barbee agreed with Davis' blind conclusion, and emailed a reply stating in his opinion: "there would be shingles torn off [sic] roof before actual structure actually was lifted by force of wind."  *Id.*

38.     On September 13, 2005, after getting Homesite's approval, Davis hand picked Richard "Ricky" Steed (herein "Steed") with Professional Inspection Consultants (herein "PIC") to perform the inspection, promised three (3) days earlier to Gary Martin. Contrary to Davis' representation to Martin, Steed is not a structural engineer.

39.     Regardless, Steed did not ever inspect the Martin house but instead sent a lay assistant, Glenn Bryant, who had no professional credentials or licenses in any field

or specialty.   On September 14, 2005, Bryant showed up on the property.   Although Bryant never informed Martin that he was not an engineer, he walked on the roof of the Martin house, and like Davis, saw the obvious deflection in the roof structure.

      40.    Without taking any measurements, inspecting any rafters, or looking beneath the roof sheathing, Bryant blindly concluded that the roof rafters of the Martin house were spaced two (2) feet apart, and therefore defective.

      41.    Using Bryant's notes yet never having stepped foot on Martin property, Steed prepared – and under his license as a civil engineer – signed an "inspection" report blindly concluding that the roof deflection was not related to Katrina.   Grammatically, Steed's report had over 40 plural pronouns in it, stating for example "we have inspected" . . . "our inspection revealed" . . . "we did not find" . . . "we noted", etc.   (Underlines added).   A copy of Steed's report (herein "the 2005 Steed report" or "Steed report") is attached to the original Complaint as Exhibit 6.

      42.    In pertinent part, the 2005 Steed report states:

. . .

    3.    We believe the overall sagging of the roof slopes and the sagging between the rafters on the main house is caused from lack of support to the rafters across the roof structure and not related to the recent wind event.

*Id*. at p.4.

      43.    Within thirty-six (36) days of Katrina, never having provided the promised structural engineer's inspection, taken any measurements, inspected rafters, or even looked beneath the roof sheathing, Homesite considered the matter of Martin's Katrina damage settled, and issued a check in the amount of $2,341.49.   Before Bryant's site visit and the 2005 Steed report was even drafted, Davis had already pre-determined to pay

- 10 -

Martin exactly $2,341.49.[1]  (*See* Crawford-Homesite claims log, attached to the original Complaint as Exhibit 5).  The Steed report managed to confirm just enough damage on the house to total up the $2,341.49 in damages Davis had already pre-determined to pay.

44.     Utilizing the contrived Steed report to back up Davis' blind assertion of faulty design and workmanship, on October 4, 2005, Homesite determined that it would not pay any coverage benefits for roof damage to the Martin house.

45.     On October 6, 2005, Homesite closed Martin's Katrina claim (No. 1026634) but did not send a copy of the Steed report to Martin.  Nor did Homesite tell Martin that Bryant, the only person who had "inspected" the Martin house after Davis, was not an engineer but a mere layman.  No Homesite engineer ever visited or inspected the Martin house at any time prior to the date coverage was denied.

46.     Still not informed of Homesite's covert denial, on October 25, 2005, within sixty (60) days of Hurricane Katrina, Gary Martin mailed to Homesite a sworn proof of loss.  In the same parcel Gary Martin included a $119,990.40 written estimate of the cost to repair and replace roof damage from Katrina.  The certified letter was received and signed for by a representative of Homesite.  (*See* certified mail proof of delivery, attached to the original Complaint as Exhibit 7).

47.     On October 25, 2005, the same certified letter and estimate was mailed to Crawford & Company.   The certified letter was received and signed for by a representative of Crawford & Company on October 26, 2005.  (*See* certified mail proof of delivery, attached to the original Complaint as Exhibit 8).

48.     In November 2005, Homesite sent another adjuster to inspect the Martin house for electrical appliance damage thought to be caused by a lightening storm.

----

[1] The report estimate is $2,841.49, which was reduced to $2,341.49 after the $500.00 deductible.

Receiving instructions from Homesite, the new adjuster[2] did not inspect or even inquire about the obviously deflected roof structure of the Martin house.

49.     No Homesite engineer or adjuster inspected the roof structure or rafters of the Martin house during the months of November or December, 2005, or January or February of 2006.

50.     On January 23, 2006, Andrew Mimms Dyess (herein "Dyess"), hired by Gary Martin as a public adjuster, made written demand on Homesite to pay roof repair costs of $119,990.40.   Dyess also demanded that Homesite provide in writing its "arguable reason" for failing to pay the insured's claim.

51.     Contrary to official postal records, on February 14, 2006, Homesite's claims agent Maria Loffredo (herein "Loffredo") falsely stated in writing to Dyess/Martin that Homesite did not have a sworn of proof of loss.  In response, Dyess mailed proof of delivery of the 10/25/05 certified letter to Homesite.  (*See* Loffredo letter, attached to the original Complaint as Exhibit 9).

52.     Ignoring Loffredo's deceitful statement, on February 16, 2006, Homesite's claims agent Gus Mueller (herein "Mueller") wrote a denial of coverage letter to Dyess/Martin stating that the 2005 Steed report says there is faulty design and workmanship ". . . that is causing a lot of the reported damage" to the Martin house.  As the basis for coverage denial, Mueller advised Dyess/Martin that faulty design and workmanship is excluded under the policy.  Mueller confirmed in the letter that Martin's Katrina claim had been closed on October 4, 2005, and rejected a second copy of the proof of loss.  (*See* Mueller letter, attached to the original Complaint as Exhibit 10).

---

[2]  The new adjuster was Montgomery "Monty" Hughley of Eagle Adjusting Service.

53.     No Homesite engineer personally visited or inspected the Martin house at any time prior to Mueller's denial of coverage letter, dated February 16, 2005.

**B.     PLAINTIFF'S TORNADO WINDSTORM LOSS OF MAY 27, 2006**

54.     Katrina-damaged and still unrepaired, on May 27, 2006, a tornado windstorm struck the Martin house further damaging the weakened roof structures of the main house and porches.

55.     Gary Martin gave timely notice of his claim to Homesite in compliance with terms of the 2006 policy.

56.     After notice to Homesite, on June 8, 2006, Monty Hughley of Eagle Adjusting Service, Inc., as agent for Homesite, arrived to inspect the Martin house for damage.

57.     Gary Martin met Hughley in person at the Martin house and told him about the previous roof damage caused by Katrina.  Hughley informed Martin that he had been instructed by Homesite that rafter damage was outside of his scope of damage assessment because it was the subject of the Katrina claim which "is not settled."  To the contrary, Homesite had already denied and closed Martin's Katrina claim in October 2005 without ever inspecting the rafters beneath the main and porch roof sheathings.

58.     Four days later, on June 12, 2006, Hughley wrote Julietta Stone (herein "Stone") of Homesite advising that his inspection revealed that the roof of the Martin house will need to be replaced due to wind and hail damage.  Hughley wrote Stone that a tornado had hit in the area of the Martin house, and noted trees down in the yard. Hughley reported to Stone that the roof had been lifted, leaving a gap in the roof and wall of about 3 inches.  Hughley included a photo of a neighbor's house showing the upper

story sheared-off from the tornado.  Hughley advised Stone that the prior damage from Katrina has weakened the roof allowing it to lift up more than it was.  Hughley told Stone the interior ceilings were damaged "due to the roof leaking but the roof has not been fixed since the hurricane claim."  Hughley told Stone that he would not stay in the home if a severe storm came through the area "due to a wall under the roof and the porch . . . [which] is bowed out."  Hughley concluded by telling Stone:  "The roof, rafters, and joist need to be removed and replaced due to being lifted above three inches."  (*See* Hughley report, dated June 12, 2006, entitled "Final Report," attached to the original Complaint as Exhibit 11).[3]

59.     Despite having written notice from its own adjuster that coverage benefits were owed for the replacement of the roof, rafters and joists, both as a result of Katrina and the tornado windstorm, Homesite continued to deny coverage benefits under the false premise of faulty design and workmanship.  Knowing the insured was economically unable to remove to roof sheathing and hire his own structural engineer, Homesite persisted in refusing to inspect the rafters beneath the roof sheathing.  Instead, Homesite paid Martin for shingles, some damaged fascia boards, ceiling and drywall, and again closed the claim (No. 0001038306).

60.     No Homesite engineer or adjuster inspected the roof rafters of the Martin house at any time during the month of June 2006.

61.     Approximately one month later, on July 7, 2006, Chad Ferrari (herein "Ferrari") of Homesite's claims department told Martin over the phone that Martin's Katrina claim was "settled."  Ferrari never revealed to Martin that, when Hughley

_____

[3]  Hughley's report contains an erroneous date of loss "11/27/06"; it should state "May 27, 2006."

inspected, Homesite had falsely advised Hughley that the Katrina claim was not settled.

62.  Desperate and with no other options available, Martin retained counsel and filed suit.[4]

63.  After approximately 2 years of groundless claim denial, on August 20, 2007, during the course of discovery, Homesite's vice president Brendan Voss (herein "Voss") heard the Plaintiff's live testimony and admitted that the claim had not been fully paid.  Voss agreed to conduct a joint expert inspection and move promptly to get the roof damages assessed and paid.  At several thousand dollars cost to Plaintiff, his retained expert Dr. Neil Hall showed up on the mutually agreed date to inspect.  Homesite reneged, and despite being contacted and urged to participate as promised, flatly refused to participate or provide any expert for joint inspection.

64.  Trapped by Homesite's stonewalling, with the financial assistance of his attorneys Martin eventually hired day laborers to remove two swatches of roof sheathing on the main house.  Just in the limited area inspected, Martin photographed a total of twelve (12) cracked rafters, all made of 2 x 10 inch boards less than 2 years old.  (*See* sample photos, Bates numbered: "536 000257; 536 000258; 536 000263; 536 000266; 536 000278; 536 000279"; attached to the original Complaint as Exhibit 12).  Martin also photographed porch rafters after removing porch sheathing.  The porch roof photos showed cracked 2 x 8 inch solid wood rafters above the front porch, which faces west. (*See* sample photos, Bates numbered: "536 000268; 536 000282"; attached to the original Complaint as Exhibit 13).

_____

[4] Martin first filed in state court, and was removed by Homesite.  Eventually, the non-diverse defendant was dropped and the suit remained in federal court.  *See Martin vs. Homesite Group Incorporated, Chris Rawson, Crawford & Company,  and John Doe*; 3:06-cv-536 DPJ-JCS, United States District Court for the Southern District of Mississippi, Jackson Division.

65.     On August 20, 2007, Homesite was furnished 13 color photos Bates numbered: "Martin 0001, 0004, 0005, 0010, 0011, 0013, 0014, 0022, 0023, 0025, 0039, 0041 [and] 0042."  The photos show cracked rafters supporting the main house roof where the rafters join and notch across the top plates of a stud wall.  (*See* photos, Bates numbered: "Martin 0001, 0004, 0005, 0010, 0011, 0013, 0014, 0022, 0023, 0025, 0039, 0041 [and] 0042"; attached to the original Complaint as Exhibit 14).

66.     On August 20, 2007, Homesite was additionally furnished 5 color photos Bates numbered: "Martin 0016, 0017, 0018, 0029 [and] 0040"; showing separation of the main roof from the interior wall of the Martin house.  (*See* photos, Bates numbered "Martin 0016, 0017, 0018, 0029 [and] 0040"; attached to the original Complaint as Exhibit 15).

67.     After receiving indisputable photographic evidence of structural roof damage, Homesite refused to tender coverage benefits, refused to conduct an inspection of the damage, and persisted in falsely claiming the faulty design and workmanship exclusion justified claim denial.

68.     On December 3, 2007, Homesite was furnished 43 color photos of main roof and porch roof damage, Bates numbered: "536 000245 – 536 000287".  (*See* main and porch roof photos, attached to the original Complaint as Exhibit 16).

69.     Again, Homesite refused to tender coverage benefits, refused to conduct an inspection of the damage, and persisted in falsely claiming the faulty design and workmanship exclusion justified claim denial.

70.     Instead of tendering coverage benefits, Homesite tied Martin up in over two years of senseless and vexatious litigation, at times utilizing tricks and shams to

dodge its indisputable obligation to pay. For example, when Martin indicated he thought the damage initially weakening the roof was from Katrina, Homesite moved quickly to make Martin commit in his lawsuit that he was only seeking damages from the Katrina event, and not from the tornado windstorm. Although Homesite knew all along it owed for the structural roof damage regardless of which event initiated the damage, Katrina or the tornado, it aggressively "gamed" Martin in an attempt to spuriously defeat payment of his claims. Employing economic coercion through needless, expensive and protracted litigation, Homesite has denied Martin's claim for over 3 years without ever having a legitimate or even arguable reason.

71.     Despite its promise to Martin over 2,000 days ago, no Homesite structural engineer has ever visually inspected the rafters or roof substructure of the Martin house and porches.

72.     During the interminable ordeal with Homesite, Gary Martin fell from his roof while trying to mitigate water leakage from Katrina. Self-employed, Martin was now unable to earn wages and regularly service his mortgage note. At the same time, Martin could not stop the mortgage from lapsing into arrears and foreclosure by selling the house because the roof was in a seriously damaged and dangerous state of disrepair due to Homesite's persistent refusal to tender coverage benefits. Keenly aware of Martin's dilemma, Homesite used the economic pressure of Martin's dire position to squeeze the insured, ultimately causing Martin to lose his entire 40 acre estate and less than 3 year old family home to foreclosure. (*See* letter of attorney Mary McAlister, dated October 17, 2007, of attached to the original Complaint as Exhibit 17). Once the home and property was lost, Homesite conspired with the new purchaser of the home to obtain

- 17 -

false statements that the damage to the roof of the house was minimal, and amounted to less than one thousand dollars.

73.     When Martin was able to finally get a trial date set for his case, approximately one month before trial was to start Homesite suddenly claimed that Martin's former mortgage company had to be joined as an indispensable party.  Knowing all along about the mortgage and promissory note, Homesite had remained silent for over 730 days, until Martin fixed a trial date.  Worse yet, acting with extreme malice, Homesite knew that Martin's former mortgage company had assigned its interest away, and there was no ground to urge joinder of a party who had no longer had any interest under the insurance contract.  Homesite employed this tactic to further delay and frustrate Martin's effort to obtain the coverage benefits, expecting that Martin would eventually acquiesce and cave-in.  Persevering in its plan to apply maximum economic pressure, a month before the trial date Homesite called and wrote IndyMac Bank in California and obtained a false statement from its attorney that Deutsche Bank, IndyMac's assignee, had a deficiency judgment against Martin from the mortgage foreclosure.  In an effort to extract a low ball settlement and further beat Martin down, Homesite filed pleadings alluding to a supposed $100,000.00 deficiency judgment, and went so far as to transmit the attorney's false statement to the presiding judge in Martin's Katrina case.[5]  (*See* email of Donald D. Bundy, IndyMac Mortgage general counsel, attached to the original Complaint as Exhibit 18).

## VII.
### CLAIMS FOR RELIEF

74.     As to each claim for relief stated below, Plaintiff re-alleges the text and

---

[5] *See* footnote 4.

content of every averment or allegation in paragraphs 1–73 of the First Amended Complaint.

## VIII.
### FIRST CLAIM FOR RELIEF
#### BREACH OF CONTRACT

75.    Plaintiff entered into an insurance contract with the Homesite for the policy period of calendar year 2005.  The 2005 policy was renewed for the calendar year 2006.

76.    On August 29, 2005 (Katrina), and May 27, 2006 (tornado windstorm), Plaintiff sustained physical direct losses to insured property covered under the 2005 and 2006 policies.

77.    Plaintiff complied with the terms of the policies by timely submitting claims for the covered losses caused by Katrina and the tornado windstorm.

78.    At all relevant times, the Homesite had a non-delegable duty to adjust, adequately investigate and voluntarily pay coverage benefits owed under the 2005 and 2006 policies.

79.    The Defendant's non-delegable duty applies both before and after suit is filed, and continues every day though the claims may be in litigation, and contested.

80.    Homesite breached the policies by failing and refusing to pay thousands of dollars in coverage benefits owed to Plaintiff for his 2005 Katrina and 2006 tornado windstorm losses and claims, *inter alia*, in the following ways:

(a)    failing to conduct a prompt, honest and adequate investigation and adjustment of the 2005 Katrina claim, and 2006 tornado windstorm claim;

(b)    refusing, without legitimate or arguable reason, to voluntarily pay coverage benefits owed and wrongly withheld under the 2005 and 2006

policies;

(c)     misrepresenting that a structural engineer would be provided to conduct an inspection of the sagging roof rafters and substructure, following the Katrina loss and claim;

(d)     engaging in "claims steering" by hand picking an engineer (Steed) who never actually inspected, and procuring a contrived and dishonest inspection report created for the purpose of falsely supporting a sham faulty design and workmanship defense;

(e)     uttering false written statements to the insured by claiming that a sworn proof of loss for the 2005 Katrina loss and claim, sent by certified mail in October 2005, and containing a $119,990.40 roof damage estimate, had never been received;

(f)     as a basis for denying payment of thousands of dollars in coverage benefits owed as a result of the 2005 and 2006 losses and claims, relying without legitimate or arguable reason on a policy exclusion repeatedly proved to be inapplicable to the claims;

(g)     forcing the insured into costly and protracted legal action for him merely to obtain coverage benefits for the 2005 and 2006 losses which, under law, were required to be voluntarily and fully paid without the necessity of a lawsuit;

(h)     after suit was filed, having stated a false and inapplicable basis for denial, persistently refusing to voluntarily and fully pay thousands of dollars in coverage benefits owed as a result of the 2005 and 2006 losses and claims;

(i)     misrepresenting to the insured that an adjuster would conduct an honest and objective inspection and investigation of the 2006 tornado windstorm loss and claim, including an inspection of the already weakened roof rafters damaged 9 months previous by Katrina;

(j)     after the 2006 tornado windstorm loss and claim, engaging in "claims steering" by directing the assigned adjuster not to assess loss for the already weakened roof rafters damaged over 9 months previous by Katrina;

(k)     while knowing that Plaintiff was in dire economic straits and about to lose his 40 acre estate and home by mortgage foreclosure, wrongfully and dishonestly divesting Plaintiff of the use and benefit of thousands of dollars in coverage benefits owed as a result of the 2005 Katrina and 2006 tornado windstorm losses and claims;

(l)     after suit was filed, despite admitting the Katrina claim was not fully paid, and agreeing to a joint inspection to assess and pay for the uncompensated losses, reneging, stonewalling and refusing to participate in the mutually agreed upon inspection;

(m)    knowing that the extent of the roof rafter damage was hidden beneath 4,475 square feet of shingles and decking, and could not be easily accessed, using economic coercion to force the insured to adjust and investigate his own claim;

(n)     after breaching the duty to adequately investigate, and stonewalling all attempts to obtain an investigation, employing a litigation shell game designed to trap the insured into picking a single loss event which initially caused the rafter damage;

(o)     after falsely representing to the insured that his recovery in the suit would be subject to liens and claims of third parties, using economic coercion against the insured by attempting to force the joinder of a mortgage bank approximately one month before trial was to start, and when no valid grounds existed for such alleged liens;

(p)     after suit was filed, in an effort to falsely conjure a failure to cooperate defense, representing to the insured, his counsel and the court, that a "misunderstanding" existed with respect to inspection of a part of the premises, and that Plaintiff had refused a request to inspect.

**81.**     Homesite's breach of the 2005 and 2006 policies is the proximate cause of damages sustained by Plaintiff.

**82.**     As a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for the Homesite's breach, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

## IX.
### SECOND CLAIM FOR RELIEF
### TORTIOUS BREACH OF CONTRACT
### (COVENANT OF GOOD FAITH AND FAIR DEALING)

**83.**     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

**84.**     At all relevant times, the Plaintiff's Homesite policies were subject to an

implied covenant requiring that Homesite exercise good faith and fair dealing in handling Martin's Katrina and tornado windstorm losses and claims.

85.     Homesite's covenant of good faith and fair dealing applies both before and after suit is filed, and continues every day though the claims may be in litigation, and contested.

86.     Homesite tortiously breached its duty of good faith and fair dealing to Plaintiff, *inter alia*, as specified in (a)–(p), ¶ 80 above.

87.     Homesite's tortious breach of the covenant of good faith and fair dealing is the proximate cause of damages sustained by Plaintiff.

88.     As a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for the Defendant's tortious breach, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

## X.
### THIRD CLAIM FOR RELIEF
#### NEGLIGENCE AND GROSS NEGLIGENCE

89.     At all relevant times, Homesite had a non-delegable duty under Mississippi law to Plaintiff, which included, without limitation, the duty to use reasonable care in adjusting, adequately investigating and voluntarily paying coverage benefits owed, without the necessity of legal coercion.

90.     The Defendant's non-delegable duty applies before suit is filed, and continues to apply after the filing of suit.

91.     Homesite acted negligently, and with gross negligence, and breached its duties to Plaintiff, *inter alia*, as specified in (a)–(p), ¶ 80 above.

92.     Homesite's breach of duty is the proximate cause of damages sustained by

Plaintiff.

93.     As a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for the Defendant's tortious breach, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

## XI.
### FOURTH CLAIM FOR RELIEF
### NEGLIGENT MISREPRESENTATION

94.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

95.     At all relevant times, Homesite had a non-delegable duty under Mississippi law to Plaintiff, which included, without limitation, the duty to refrain from negligently misrepresenting material facts to Plaintiff in connection with handling of his Katrina and tornado windstorm claims.

96.     The Defendant's non-delegable duty applies both before and after suit is filed, and continues though the claims may be in litigation, and contested.

97.     Homesite negligently breached their duty to Plaintiff, *inter alia*, as specified in (a)–(p), ¶ 80 above.

98.     Homesite's negligent breach of duty is the proximate cause of damages sustained by Plaintiff.

99.     As a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for the Defendant's tortious breach, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

## XII.
### FIFTH CLAIM FOR RELIEF
#### FRAUD AND INTENTIONAL MISREPRESENTATION

**100**.     Over the nearly 3 year period Plaintiff has attempted to obtain coverage benefits, Homesite has repeatedly made representations to Plaintiff which were false and material, and which were known by the Defendant to be false.

**101.**     In making such false representations, Homesite intended that Martin should act upon the representations in the manner Homesite reasonably contemplated.

**102**.     Martin was not aware of the falsity of such representations, and relied on Homesite's statements and representations as being truthful.

**103**.     As an insured homeowner and coverage benefits claimant who at all times was justified in expecting good faith and fair dealing from Homesite, Martin had a right to rely on Homesite's statements and representations.

**104.**     Homesite's false and material misrepresentations are the proximate cause of damages sustained by Plaintiff.

**105.**     As a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for the Defendant's false and material misrepresentations, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

## XIII.
### SIXTH CLAIM FOR RELIEF
#### CIVIL CONSPIRACY

**106.**     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

**107.**     Over the nearly 3 year period Plaintiff has attempted to obtain thousands of dollars in unpaid coverage benefits, Homesite has persistently conspired with other

individuals and/or entities to spuriously defeat Plaintiff's claims owed under the 2005 and 2006 policies.  Such acts or omissions were part of a common plan or scheme to defeat Plaintiff's coverage benefits, utilizing underhanded tactics such as claims steering.

108.    By way of example only, the actors/co-conspirators in Homesite's civil conspiracy, some of whom are identified in paragraphs 11–73 above, include: Michael Davis; Jim Barbee; Crawford & Company (Davis' and Barbee's employer); Glenn Bryant; Richard Steed; Professional Inspection Consultants, Inc. (Steed's and Bryant's employer); Maria Loffredo; Gus Mueller; Chad Ferrari; Brendan Voss (employees of Homesite); Montgomery Hughley; Eagle Adjusting Services, Inc. (Hughley's employer); IndyMac Mortgage; Donald D. Bundy,  (IndyMac Mortgage's general counsel); IndyMac Bank, FSB; J. Gary Massey; Shapiro & Massey, LLP (Massey's employer); Deutsche National Bank Trust; B.R. Adams; and Adams Properties, LLC (B.R. Adams' company).

109.    At all relevant times, the objective of the conspiracy between Homesite and its co-conspirators was to defeat the payment of thousands of dollars in coverage benefits owed to Plaintiff under the 2005 and 2006 policies.

110.    At all relevant times, there was a "meeting of minds" between Homesite and its co-conspirators as to the objective and course of action of the conspiracy would take.

111.    The conspirators committed one or more unlawful overt acts in furtherance of their objective – to defeat the payment of thousands of dollars in coverage benefits owed under the 2005 and 2006 policies.

112.    The conspirators' conduct is the proximate cause of damages sustained by Plaintiff.

**113.**    As a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for Homesite's civil conspiracy to defeat the payment of thousands of dollars in coverage benefits, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

### XIV.
### SEVENTH CLAIM FOR RELIEF
### AIDING AND ABETTING FRAUD AND CIVIL CONSPIRACY

**114.**    Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

**115.**    On information and belief, the John Doe 1–10 Defendants are persons or entities affiliated either with Homesite, its co-conspirators, or others who have acted in concert with them, although the identities and the full extent of Doe Defendants' acts or omissions are currently unknown.

**116.**    On information and belief, the Doe Defendants aided and abetted the wrongful and fraudulent denial of Plaintiff's insurance claims under the 2005 and 2006 policies.

**117.**    On information and belief, Homesite and/or its co-conspirators knew that the Doe Defendants' actions were aiding and abetting the false and contrived grounds for denial of thousands of dollars in coverage benefits owed to Plaintiff under the 2005 and 2006 policies.

**118.**    On information and belief, although Homesite and/or its co-conspirators knew the Doe Defendants' actions constituted a breach of duty to Plaintiff, Homesite and/or its co-conspirators gave substantial assistance or encouragement to the Doe Defendants' aid and abetment.

**119.**    On information and belief, Homesite and/or its co-conspirators' conduct is the proximate cause of damages sustained by Plaintiff.

**120.**    On information and belief, as a result, Plaintiff is entitled to actual, extra contractual, punitive and consequential damages for Homesite's acts and omissions in furthering the aid and abetment, plus pre- and post-judgment interest, costs of litigation and attorneys' fees.

**XV.**
**EIGHTH CLAIM FOR RELIEF**
**HOMESITE'S WAIVER OF THE FAULTY**
**DESIGN AND WORKMANSHIP EXCLUSION**

**121.**    Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

**122.**    At all relevant times, Homesite had the right (and obligation) to investigate and inspect the Martin house for structural roof damage stemming from Katrina and the tornado windstorm.

**123.**    Over 1,000 days ago, Homesite promised its insured Gary Martin that a structural engineer would inspect for roof damage, it being self-evident that the less than one year old roof was notably sagging.  Instead, Homesite sent a lay person whose mission was to lay the groundwork for a false and contrived "inspection" report to be signed by Steed, who had never stepped foot on the property.  When Homesite learned that Davis' and Steed's blind conclusion that the roof rafters were 2 feet apart was false, it took no action to rescind its denial based on faulty design and workmanship.  Homesite knew all along that the true extent of rafter damage was well hidden beneath 4,475 square feet of shingles and decking, which, economically speaking, was virtually inaccessible to Plaintiff.

124.    After forcing Martin into litigation, Homesite's vice president Brendan Voss admitted that Plaintiff's claims had not been fully paid, and again promised to inspect and pay the coverage benefits withheld.  Again, Homesite reneged on their promise, stonewalled Plaintiff, and falsely relying on a negated policy exclusion, persisted in refusing to investigate the roof damage.

125.    Homesite forced the insured to incur substantial costs of inspecting and adjusting his own claim when it persistently refused to do so.  When Homesite was furnished with photos indisputably showing as many as 12 cracked and fractured 2 x 10 inch rafters from sample roof sections, it took no action to rescind its denial based on faulty design and workmanship, or tender coverage.

126.    After a tornado windstorm delivered a second blow to the weakened house, Homesite's own adjuster told the insurer that the roof rafters and joists needed to be replaced.  Again, Homesite took no action to rescind its denial based on a falsely argued policy exclusion, or tender coverage.

127.    For over 3 years Homesite has withheld thousands of dollars in coverage benefits when it knew all along that its defense to non-payment was false and groundless.  With minimum diligence, in a matter of a few hours Homesite could have easily ascertained the damage to the roof rafters and substructure of the Martin house.  Homesite needed look no further than its own claims file and examine the photos taken during Martin's own inspection.

128.    As a result of the aforesaid acts and omissions, Homesite knowingly and intentionally waived and relinquished any right under the 2005 and 2006 policies to assert the faulty design and workmanship exclusion in defense of Martin's Katrina and

tornado windstorm claims.  (*See*, ¶ 2 (c), p. 9 of 18, Exh. 2).

## XVI.
### NINTH CLAIM FOR RELIEF
#### EQUITABLE ESTOPPEL

129.    Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

130.    Reference is made to the averments of paragraphs 11–73; 80 (a)–(p); and 121–128 aforesaid.  Gary Martin believed and relied upon the multiple representations of Homesite that his roof damage from Katrina and the tornado windstorm would be adequately and objectively discerned, and promptly paid for under the terms of the 2005 and 2006 policies.

131.    As detailed in paragraphs 11–73; 80 (a)–(p); and 121–128 aforesaid, Martin's belief in Homesite's representations caused him to substantially change his position in reliance thereon.

132.    As detailed in paragraphs 11–73; 80 (a)–(p); and 121–128 aforesaid, Martin's belief in Homesite's representations caused him to suffer extreme detriment and prejudice, ultimately resulting in the loss of his entire 40 acre estate and home.

### DAMAGES

133.    Plaintiff hereby incorporates and adopts by reference each and every allegation set forth in all foregoing Paragraphs of the First Amended Complaint.

134.    As a direct and proximate result of Defendants' aforesaid acts and omissions, Plaintiff Gary Martin is entitled to the following relief, less credits, if any, Homesite can show for coverage benefits paid:

> a.    actual and consequential damages for breach of contract equal to the repair and replacement of the roof of the Martin house and surrounding porches,

plus any and all costs necessarily incurred as part of a full roof replacement;

b.  actual and consequential damages for breach of contract for the loss of use reasonably associated with a full roof replacement of the Martin main house roof and surrounding porches, including the estimated costs of packing and moving personal property from the house, storing same, and the costs of a substitute place to reside during the construction;

c.  under *Veasley*,[6] actual, consequential and foreseeable damages for breach of contract, including mental distress, emotional harm, costs of litigation and attorneys fees incurred and proximately caused by the Homesite's persistent breach and refusal to investigate and voluntarily pay coverage benefits due under the 2005 and 2006 policies of insurance;

d.  extra-contractual and punitive damages for tortious breach of contract caused by the Homesite's persistent breach and refusal to investigate and voluntarily pay coverage benefits due under the 2005 and 2006 policies of insurance;

e.  actual and consequential damages proximately caused by negligent misrepresentation;

f.  actual, consequential, extra-contractual and punitive damages for negligent and grossly negligent breach of the common law standard of reasonable care owed to Plaintiff;

g.  actual, consequential, extra-contractual and punitive damages for engaging in a civil conspiracy to defeat the payment of thousands of dollars in coverage benefits due under the 2005 and 2006 policies;

h.  actual, consequential, extra-contractual and punitive damages for encouraging and assisting others who aided and abetted the fraud and civil conspiracy designed to defeat the payment of coverage benefits due under the 2005 and 2006 policies;

i.  actual, consequential, extra-contractual and punitive damages for fraud and intentional mispresentation associated with denying the payment of coverage benefits due under the 2005 and 2006 policies;

j.  pre- and post-judgment interest retroactive to December 24, 2005;

---

[6] *Universal Life Insurance Company vs. Veasley,* 610 So.2d 290, 295 (Miss. Sup. Ct. 1992). *See also Stratford Insurance Company vs. Cooley,* 985 F.Supp. 665 (S.D.Miss. 1996).

k.  costs of litigation, including, suit filing fees, expert fees, and all costs reasonably and normally incurred in prosecuting this case for 3 years;

l.  attorneys fees, incurred by present and former counsel retained by Gary Martin in an effort to obtain coverage benefits due under the 2005 and 2006 policies;

m.  payment and discharge of any liens by non-attorney third parties who were retained by Gary Martin in an effort to obtain coverage benefits due under the 2005 and 2006 policies;

n.  the present day market value of Plaintiff's 40 acre estate and insured premises, as it existed in its original state of good repair, before Katrina and the tornado windstorm of May 27, 2006;

o.  any and all costs now or in the future claimed as deficiency amounts due from foreclosure under the assigned Deutsche Bank deed of trust and promissory note executed by Gary Martin in 2004;

p.  punitive and exemplary damages in an amount sufficient to punish and deter the Homesite Defendants, and make an example of the Defendants in order to discourage other insurers from engaging in such malicious conduct;

q.  an order and decree that Homesite has waived and cannot in this case assert any defense under the faulty design and workmanship policy exclusion in the 2005 and 2006 policies; and,

r.  an order and decree estopping Homesite from further inspecting the insured property; barring the defense of faulty design and workmanship; and prohibiting Homesite from claiming any new grounds for denial of coverage benefits.

**135.** Plaintiff respectfully requests such further general or specific relief to which he is entitled to at law or in equity.

This the 24th of September, 2008.

Respectfully Submitted,
GARY MARTIN


By:   _Derek A. Wyatt_
Derek A. Wyatt, MSB No. 7413
Attorney for Plaintiff

OF COUNSEL:

Don Barrett, MSB No. 2063
P.O. Box 987
Lexington, MS 39095
Tel: 662-834-2376
Fax: 662-834-2409
dbarrett@barrettlawoffice.com

Mary E. McAlister, MSB No. 2140
Derek A. Wyatt, MSB No. 7413
David Neil McCarty MSB No. 101620
NUTT & MCALISTER, PLLC
605 Crescent Boulevard, Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 898-7302
Facsimile:  (601) 898-7304
mcalister@davidnutt.com
dwyatt@davidnutt.com
dmccarty@davidnutt.com

Dewitt M. Lovelace, MSB No. 1449
LOVELACE LAW FIRM, P.A.
36474 Emerald Coast Parkway Suite 4202
Destin, FL 32541
Tel: (850) 837-6020
Fax: (850) 837-4093
dml@lovelacelaw.com

ATTORNEYS FOR PLAINTIFFS